## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

PINNACLE HEALTH FACILITIES XXXIII, LP,
D/B/A SAGECREST NURSING AND
REHABILITATION CENTER, and PREFERRED
CARE PARTNERS MANAGEMENT GROUP, LP

      Plaintiffs,

v.                                                                    No. CIV 15-cv-01062 RB/LAM

SARA CRECCA, as Personal Representative of the
Wrongful Death Estate of Robert Narvaez, Deceased,

      Defendants.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion to Compel Arbitration, filed on August 1, 2016 (Doc. 27). Having considered the submissions of counsel and relevant law, the Court will **GRANT** Plaintiffs' motion.

## I.      Procedural Background

This case presents the question of whether a non-signatory to an arbitration agreement can be forced to arbitrate pursuant to the third-party beneficiary doctrine under New Mexico law. In October 2013, Mrs. Ofelia Narvaez signed paperwork to admit her husband, Mr. Robert Narvaez, into Sagecrest Nursing and Rehabilitation Center (Sagecrest). Sagecrest never asked Mrs. Narvaez for an official document that gave her power of attorney to sign a contract on behalf of her husband, and Mrs. Narvaez never offered one. In fact, no such document existed. Nor did Mr. Narvaez give Sagecrest oral permission for his wife to sign the contract in his place.

Mr. Narvaez passed away while in the care of Sagecrest, allegedly due to Sagecrest's negligence. Defendant Sara Crecca, on behalf of Mr. Narvaez's Estate, filed a Complaint for

Wrongful Death, Negligence, and Punitive Damages in the Second Judicial District Court of New Mexico in August 2015. (*See* Doc. 1-D (State Compl.).) Plaintiffs Pinnacle Health Facilities XXXIII, LP d/b/a Sagecrest and Preferred Care Partners Management Group, LP (collectively Plaintiffs) filed a complaint and a subsequent motion in this court, seeking to compel arbitration per the parties' agreement. (*See* Docs. 1, 27.) Defendant opposes Plaintiffs' motion and contends that the arbitration agreement is unenforceable. (*See* Doc. 29.)

## II.   Statement of Facts[1]

Mr. Robert Narvaez, now deceased, was admitted to Sagecrest Nursing and Rehabilitation Center (Sagecrest) on October 16, 2013. (State Compl. ¶ 1.) Sometime before his admission, Mr. Narvaez suffered a stroke and was diagnosed with dementia. (Doc. 27-A at 34:4–13.) Mrs. Narvaez asserted at her deposition that the dementia had affected her husband's ability to remember things, and the stroke had impacted his judgment, reasoning, and problem-solving abilities. (*Id.* at 34:7–10, 36:7–12.) Mrs. Narvaez cared for her husband at home with the occasional help of a home health aide after Mr. Narvaez's stroke. (*Id.* at 29:2–13, 30:3–7.) Eventually, Mrs. Narvaez and her children made the decision to move Mr. Narvaez to Sagecrest, because Mrs. Narvaez had become ill and could no longer lift him. (*Id.* at 33:24–34:3.)

The Narvaezes had not executed any kind of document that gave Mrs. Narvaez power of attorney over Mr. Narvaez's healthcare decisions. (Doc. 29-1 at 50:1–17.) Mrs. Narvaez had, however, made certain healthcare decisions on her husband's behalf in the past. (*See* Docs. 27-A at 30:12–33:23, 27-I, 27-J, 27-K, 27-L.) While there is no evidence that Mr. Narvaez gave his wife

---

[1] The facts in this section are presented in a light most favorable to Defendant as the party opposing arbitration, *see Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014) (citation omitted), and are taken from Plaintiffs' Complaint to Compel Arbitration and the attached exhibits (Docs. 1 (Compl.) & Exs. A–D), as well as from the parties' briefs and exhibits relevant to Plaintiffs' motion (*see* Docs. 27 & Exs. A–L; 29 & Exs. 1–2; 31 & Exs. A–B).

or Sagecrest staff oral or written permission to sign documents on his behalf at the facility, Mrs. Narvaez completed the necessary paperwork to admit Mr. Narvaez to Sagecrest. (*See* Doc. 27-A at 38:7–43:5) Mrs. Narvaez stated that her husband was aware she was making care decisions on his behalf and did not object to her doing so, nor did he object to the decision to move him to Sagecrest. (*Id.* at 36:21–37:13, 45:24–46:15.)

A.      **The Admission Documents**

Mrs. Narvaez signed the forms necessary to admit her husband to Sagecrest on October 23, 2013, approximately one week after he was admitted to the facility.[2] (*See* Docs. 1-B, 1-C, 27-B, 27-C, 27-D, 27-E, 27-F, 27-G, 27-H; *see also* Doc. 27, at 3 ¶¶ 5–6.) Relevant to this motion, Mrs. Narvaez signed (1) the "Nursing Facility Admission and Financial Agreement" (the Admission Contract) (Doc. 1-B); and (2) the "New Mexico Agreement Regarding Resolution of Legal Disputes and Waiver of Right to Jury Trial" (the Arbitration Agreement) (Doc. 1-C).

The Admission Contract provides that the "Resident authorizes Responsible Party to be his/her agent." (Doc. 1-B at 1 ¶ 2.) Paragraph 2 describes the capacity in which the Responsible Party is signing. (*Id.*) In the space under paragraph 2, someone selected two options: (1) "attorney in fact for Resident under a durable power of attorney" and (2) "family member" (someone handwrote "wife" next to this option). (*Id.*) The Admission Contract goes on to identify what authority the Resident gives the Responsible Party the power to make; here, someone checked "financial decisions," "medical decisions," "admission, care and discharge decisions," and "other

---

[2] It is unclear from the record whether Mrs. Narvaez had possession of the admission documents for the week between her husband's admission and when she signed the documents. It is undisputed that she did *not* read the documents in the week before she signed them. (Doc. 31-B at 53:1–2.) It is also undisputed that she retained a copy of the documents after she signed them, and while she could have read them in the ten days following October 23, she did not. (*See id.* at 53:3–13.)

decisions related to Resident's personal property and well-being." (*Id.*; *see also id.* at 8–9 (authorizing, with a checkmark, certain other services, activities, and assignments).)

Mr. Narvaez's name appears in two places on the Admission Contract as the named Resident. (*See id.* at 1 ("to provide long term care for Mr. Narvaez (Resident)"), ¶ 27.) Mrs. Narvaez signed the Admission Contract as the "Responsible Party." (*Id.* at 12.) The Admission Contract contains a line for the "Resident" to sign and date, but Mr. Narvaez's signature does not appear anywhere on the document. (*Id.*)

The Arbitration Agreement provides that the parties agree to submit any disputes to arbitration, and the parties waive their right to have their claims decided in a court before a judge or jury. (Doc. 1-C ¶¶ 6, 7, 24.) It also defines both mediation and arbitration. (*Id.* ¶¶ 2–3.) The Arbitration Agreement has spaces at the bottom of each page for "Resident Initials," on which someone initialed "ON." (*Id.* at 1–5.) In paragraph 1 of the Agreement, the parties are identified as Sagecrest and Ofelia Narvaez, "his or her health care decision maker, surrogate, and any legal representative (collectively, the 'Resident')." (*Id.* at 1 ¶ 1.) The last sentence of paragraph 1 provides: "[t]he parties agree that the individuals signing this Agreement have the legal authority to do so on behalf of the party for which they are signing." (*Id.*) Ms. Laura Arriaga, the Facility Representative, wrote Mrs. Narvaez's name on the line in paragraph 1. (*See id.*; *see also* Doc 29-2 at 59:103–11[3].) On the last page of the Arbitration Agreement, there is a space for the Resident to sign and date; Mr. Narvaez did not sign it. (Doc. 1-C at 5.) Mr. Narvaez's name never appears on any page of the Arbitration Agreement. (*See id.* at 1–5.) Mrs. Narvaez's signature appears on the last page as the "Signature of Representative," underneath language that reads:

---

[3] Ms. Arriaga testified that the handwritten, printed name "Ofelia Narvaez" on page 5 of the Arbitration Agreement is her own handwriting. (Doc. 29-2 at 59:3–11.) It is essentially identical to the handwritten, printed name "Ofelia Narvaez" on page 1 of the Arbitration Agreement. (*See* Doc. 1-C at 1, 5.)

4

> I am the Representative of the Resident and, in that capacity, as well as individually, I seek to obtain care and services for the Resident. I am signing this Agreement on behalf of the Resident as well as on my own behalf. I am authorized to sign this Agreement on behalf of the Resident. If I have authority to act on behalf of the Resident, pursuant to a power of attorney, conservatorship, or guardianship, I have provided a copy of the legal documents to support my authority to sign this Agreement on behalf of the Resident.

(*Id.* at 5.) On the blank marked "Legal Designation," Ms. Arriaga printed Mrs. Narvaez's name and wrote "Spouse/POA." (*Id.*; *see also* Doc. 29-1, at 49:18–50:20.) Mrs. Narvaez contends that she did not have legal power of attorney for her husband, nor did she tell Ms. Arriaga that she had power of attorney. (Doc. 29-1 at 50:1–17.)

The Arbitration Agreement provides that it "is binding on the Resident, the Resident's current and subsequent legal representatives, successors, family members and heirs and any personal representative of Resident or Resident's estate and any personal representative appointed under the New Mexico Wrongful Death Act." (Doc. 1-C ¶ 21.) It also states that "[t]he decision to sign this Agreement is solely within the discretion of the Resident" and that signing "is not a condition for being admitted to the facility." (*Id.* ¶ 4.) Finally, the Arbitration Agreement states in bold lettering that the "**Resident is encouraged to ask questions or seek the advice of [an] attorney if he/she does not understand any portion of this Agreement**[,]" and it gives the Resident the right to revoke the agreement for ten days after signing it. (*Id.* ¶¶ 5, 20.)

Ms. Arriaga testified that she does not recall what training she received on the Arbitration Agreement, and she was not completely familiar with arbitration herself: she did not know exactly what happens in an arbitration, what an arbitrator is, whether the decision can be appealed, how much arbitration costs, and so on. (Doc. 29-2 at 30:18–34:6.) Ms. Arriaga said that she normally obtains a copy of the power of attorney from the person who is signing documents on behalf of the resident, and she keeps that on file. (*Id.* at 35:21–37:1.) If there is no power of attorney document,

her practice is to verbally obtain the resident's permission to have someone sign admission documents on the resident's behalf and then record the fact of that conversation on a typed document with the resident's and Admission Director's signatures. (*Id.* at 37:2– 38:4.) Ms. Arriaga does not recall the circumstances surrounding Mr. Narvaez's admission: she does not remember discussing who could sign admission documents with Mr. Narvaez, nor does she recall seeing a power of attorney form giving Mrs. Narvaez legal authority to make decisions for Mr. Narvaez. (*Id.* at 58:10–59:2, 61:12–22.)

In addition to the Admission Contract and Arbitration Agreement, Mrs. Narvaez signed several other documents relevant to Mr. Narvaez's treatment at Sagecrest, including an "Authorization of Self Administration of Drugs" (where Mrs. Narvaez agreed Mr. Narvaez would *not* exercise his right to self-administer medication), a "Do Not Resuscitate" order, and a "Record of Informed Consent" (where Mrs. Narvaez refused to give consent for the use of restraints). (Docs. 27-F–H.) Mrs. Narvaez also signed forms related to financial decisions, including a "Financial Information" form (in which Mrs. Narvaez disclosed Mr. Narvaez's assets and monthly sources of income and agreed that either Mr. Narvaez or Mrs. Narvaez—as the "responsible party"—"agrees to pay for Resident's care and services provided by" Sagecrest) (Doc. 27-B), and a "Financial Agreement" form (where Mrs. Narvaez agreed to "manage Resident's financial resources and pay for goods and services provided by" Sagecrest, and to apply for state and/or federal assistance if Mr. Narvaez became unable to pay) (Doc. 27-C).

### B.   Mrs. Narvaez's Understanding of the Admission Documents

Mrs. Narvaez's first language is Spanish. (Doc. 29-1 at 54:8–13.) When Ms. Arriaga went over the documents with Mrs. Narvaez at Sagecrest, Ms. Arriaga explained the documents "[i]n a few words" in Spanish. (*Id.* at 47:20–48:3.) Mrs. Narvaez testified that she does not know what

the word "arbitration" means, she has never heard the word before, and she does not remember whether Ms. Arriaga explained it to her when she signed the documents. (*Id.* at 48:4–16.)

Mrs. Narvaez asserted that Ms. Arriaga made marks on the documents where Mrs. Narvaez should sign, but she did not offer Mrs. Narvaez either an interpreter or an attorney. (*Id.* at 47:2–48–3, 49:6–13, 54:8–23.) Mrs. Narvaez had possession of the documents after she signed on October 23, 2013, for the ten day grace period given in the Arbitration Agreement (Doc. 1-C ¶ 20), but she did not read through them or ask an attorney to review them. (Doc. 29-1 at 52:25–53:13; *see also* Doc. 31-B at 55:5–56:22.) Mrs. Narvaez stated that while she did have time to read the documents, she was busy caring for her husband and she had a lot of things on her mind. (Doc. 31-B at 39:16–40:3, 53:8–13.) She believed that she had to sign the documents so that her husband could stay at Sagecrest, and she did not believe that she could have transferred her husband to another facility, because he was already at Sagecrest.[4] (*Id.* at 52:7–24.)

Mrs. Narvaez's attorney secured an interpreter for her deposition. (*See* Doc. 31-B at 4:8–14.) At the beginning of the deposition, Mrs. Narvaez expressed a desire to "listen to the questions in English and just respond in Spanish." (*Id.* at 4:20–22.) Ms. Tamara Safarik, attorney for the Plaintiffs, asked Mrs. Narvaez: "You understand if I speak in English?" (*Id.* at 5:9.) Mrs. Narvaez answered in English, "Yes, I understand English. But it is more comfortable for me to [answer] in Spanish." (*Id.* at 5:10–11.) There was difficulty in allowing Mrs. Narvaez to listen to the questions in one language and respond in another, however, because the interpreter needed Mrs. Narvaez to wear a special pair of headphones to assist in the interpretation. (*See id.* at 4:15–5:25.) Eventually, Mrs. Narvaez agreed to wear the headphones, allowing the interpreter to interpret both the attorneys' questions and Mrs. Narvaez's answers. (*Id.* at 5:12–25.)

---

[4] The Court can find no testimony or other evidence about the availability of other nursing homes in Las Cruces.

While Mrs. Narvaez agreed during her deposition that she "understand[s] things better" and is more comfortable speaking in Spanish (Docs. 29-1 at 54:8–13; 31-B at 5:10–11), she also asserted that she understands both spoken and written English (*see*, *e.g.*, Doc. 31-B at 5:9–11, 11:25–12:1, 17:10–12, 40:18–23). She stated that when she served as a juror in a trial sometime prior to these events, the judge asked her if she needed an interpreter, and she told the judge she did not require one. (*Id.* at 6:11–7:14.) She asserted that she has no difficulty reading in English (*id.* at 17:10–12), and the fact that the Admission Contract was in English did not impact her ability to read or understand it (*id.* at 40:8–23).

## III.    Motion to Compel Arbitration Standard

In determining whether the parties agreed to arbitrate, the Court "must give 'the opposing party the benefit of all reasonable doubts and inferences that may arise.'" *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (quoting *DeArmond v. Halliburton Energy Servs., Inc.*, 81 P.3d 573, 576 (N.M. Ct. App. 2003) (internal quotation omitted)); *see also Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014) (finding that a court may grant a motion to compel arbitration when, "viewing the facts in the light most favorable to the party opposing arbitration[,]" it is clear that the parties actually agreed to arbitrate) (citation omitted). It is true that the Federal Arbitration Act (FAA) "provides a procedure for parties to compel arbitration, *see* 9 U.S.C. § 4," but courts must first establish whether an enforceable agreement to arbitrate exists "'before the FAA can be invoked.'" *Id.* (quoting *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1286–87 (10th Cir. 1997) (internal citation omitted)). "The party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Id.* (quoting *Corum v. Roswell Senior Living, LLC*, 248 P.3d 329, 331 (N.M. Ct. App. 2010) (internal citations omitted)). "When parties dispute the making of an agreement to arbitrate,

8

a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." *Avedon Eng'g, Inc.*, 126 F.3d at 1283 (citation omitted).

Because "arbitration is a matter of contract," courts "apply state contract formation principles [in order to] decide whether or not the parties agreed to arbitrate." *Howard*, 748 F.3d at 977 (quotation and citation omitted). The New Mexico Uniform Arbitration Act, N.M. Stat. Ann. §§ 44-7A-1 through 44-7A-32 (UAA), "provides that an agreement to submit any controversy arising between the parties to arbitration is 'valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.'" *Thompson v. THI of N.M. at Casa Arena Blanca, LLC*, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *4 (D.N.M. Sept. 12, 2006) (quoting N.M. Stat. Ann. § 44-7A-7(a)). New Mexico courts interpret the UAA "as an expression of a public policy favoring arbitration." *Id.* (citing *United Tech. & Res., Inc. v. Dar Al Islam*, 846 P.2d 307, 309 (N.M. 1993)). "In New Mexico, when the court finds that an arbitration agreement exists, then, in accordance with the UAA, the court has a duty to enforce the provisions of the agreement and order adherence to that arbitration agreement." *Id.* (citing *Bernalillo Cty. Med. Ctr. Emps. Ass'n Local 2370 v. Cancelosi*, 587 P.2d 960, 961 (N.M. 1978)).

## IV.   Discussion

Plaintiffs move to compel Defendant to arbitrate the Estate's claims against them. In support of their motion, Plaintiffs argue that the Arbitration Agreement is valid and enforceable, that Mrs. Narvaez had authority to bind Mr. Narvaez to the Arbitration Agreement, and alternatively, that Mr. Narvaez—and, hence, Defendant—are bound by the Arbitration Agreement as third-party beneficiaries. (*See* Doc. 27.)

Defendant opposes Plaintiffs' motion and presents several arguments in support of her contention that there was no legally enforceable agreement: (1) because Mr. Narvaez's name does not appear anywhere on the Arbitration Agreement, the Agreement cannot bind him or the Personal Representative of his wrongful death estate; (2) Mrs. Narvaez did not have actual or apparent authority to sign the contract on Mr. Narvaez's behalf; (3) Mr. Narvaez was not a third-party beneficiary to the Arbitration Agreement; and (4) the Arbitration Agreement is procedurally unconscionable. (Doc. 29 at 4–18.) The Court will examine each of Defendant's arguments in turn.

### A.      The Arbitration Agreement is part of a single contract for admission.

Defendant first argues that because Mr. Narvaez's name does not appear on the Arbitration Agreement, Plaintiff cannot enforce the purported contract against Mr. Narvaez or his wrongful death estate. (*Id.* at 4.) The Court disagrees. "It is a basic tenet of contract construction that a 'memorandum may consist of several writings.'" *Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1210 (N.M. 1995) (quoting Restatement (Second) of Contracts § 132 (1979)). "If two or more writings are part of a single transaction and concern the same subject matter, then they are a single contract." *Id.* (citation omitted). "Whether multiple documents consist of a single contract is determined by considering the intentions of the parties and the surrounding circumstances." *Id.* at 1210–11 (citing *Master Builders, Inc. v. Cabbell*, 622 P.2d 276, 279 (N.M. Ct. App. 1980), *cert. denied*, 622 P.2d 1046 (N.M. 1981) (internal citation omitted)).

Here, although Mr. Narvaez's name is not found on the Arbitration Agreement, it is handwritten on the Admission Contract. (*See* Docs. 1-B, 1-C.) The documents Mrs. Narvaez signed on October 23, 2013, "are to be read as a single contract as long as the circumstances establish that they relate to the same transaction." *Crow*, 891 P.2d at 1211 (citing Restatement (Second) of Contracts § 132). Judge Vazquez faced a similar question in *THI of New Mexico at*

*Vida Encantada, LLC v. Lovato* (*Lovato*), 848 F. Supp. 2d 1309 (D.N.M. 2012), and held, relying on *Crow*, that because the resident's personal representative "signed the Arbitration Agreement and the Admission Agreement on the same day as part of the same admissions process, the two documents comprise a single contract." *Lovato*, 848 F. Supp. 2d at 1315, 1327 n.2 (citing *Crow*, 891 P.2d at 1210).

The same holds true here. Mrs. Narvaez signed the admission documents, including the Admission Contract (naming Mr. Narvaez as resident) and the Arbitration Agreement (failing to name Mr. Narvaez) on or around October 23, 2013, as part of the admissions process to Sagecrest. (Doc. 27-A at 38:7–39:10, 41:14–44:6; *see also* Docs. 1-B, 1-C.) The documents concerned the same subject matter: Mr. Narvaez's admission to Sagecrest. Consequently, the Court considers them to be a single contract. Despite the fact that Mr. Narvaez's name does not appear on the Arbitration Agreement, it is clear that it is part of the larger contract that did include his name. *See Lovato*, 848 F. Supp. 2d at 1327 n.2; *Crow*, 891 P.2d at 1210–11. Because it is part of a single contract relating to Mr. Narvaez's admission to Sagecrest, Plaintiffs' motion to enforce the purported contract against Mr. Narvaez's Estate is appropriate.

**B.    The Court need not reach the issue of whether Mrs. Narvaez had actual authority to sign the Arbitration Agreement on behalf of Mr. Narvaez.**

Defendant next argues that Mrs. Narvaez did not have actual or apparent authority to sign the contract on Mr. Narvaez's behalf. Specifically, Defendant argues that Mrs. Narvaez had no authority to bind Mr. Narvaez to the Arbitration Agreement where: (1) Mr. Narvaez never granted his wife a written power of attorney; (2) Mr. Narvaez did not give verbal consent to have Mrs. Narvaez sign on his behalf; and (3) evidence that Mrs. Narvaez signed as Mr. Narvaez's decision-maker on other occasions is insufficient to establish that she was authorized to act as his agent to

bind him to the Arbitration Agreement. (Doc. 29 at 4–10.) Plaintiffs assert that Mrs. Narvaez had both actual and apparent authority to bind Mr. Narvaez to the arbitration agreement. (Doc. 27 at 11–14.) The parties agree that the issue of whether Mrs. Narvaez had authority to sign on Mr. Narvaez's behalf turns on agency law.

New Mexico law defines an agent as "a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair[,] or does some service for the principal, with or without compensation." *Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 265 P.3d 720, 725 (N.M. Ct. App. 2011) (quoting *Tercero v. Roman Catholic Diocese of Norwich*, 48 P.3d 50, 55 (N.M. 2002) (internal quotation omitted)). An agency relationship may be created orally or in writing. *See id.* (quoting *DeBaca, Inc. v. Montoya*, 575 P.2d 603, 604 (N.M. 1978) (internal citation omitted)).

"Apparent authority arises from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Id.* (quoting *Diversified Dev. & Inv., Inc. v. Heil*, 889 P.2d 1212, 1218 (N.M. 1995) (internal quotation omitted). "Actual authority is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship." *Comstock v. Mitchell*, 793 P.2d 261, 264 (N.M. 1990) (Ransom, J., specially concurring). "A principal is bound by the acts of his or her agent within the agent's actual designated authority and is also bound by the acts of the agent that the principal 'holds the agent out to the public as possessing.'" *Barron*, 265 P.3d at 725 (quoting *Fryar v. Emp'rs Ins. of Wausau*, 607 P.2d 615, 618 (N.M. 1980) (internal quotations omitted).

1.      **There is no evidence that Mrs. Narvaez had apparent authority to act on Mr. Narvaez's behalf.**

Plaintiffs argue that Mrs. Narvaez had apparent authority to sign the admission documents on behalf of Mr. Narvaez. The Court finds Mrs. Narvaez did not have apparent authority, because there is no evidence Mr. Narvaez made any manifestations to Sagecrest to demonstrate that he conveyed such authority to her, as required by New Mexico law. *See id.* at 726 (citing *Comstock*, 793 P.2d at 264 (citing Restatement (Second) of Agency § 8 cmt. e & § 27 cmt. a (1958) "apparent authority must emanate from the conduct of the person to be charged as principal")).

2.      **Plaintiffs have not met their burden to establish that Mrs. Narvaez possessed actual authority to act on behalf of Mr. Narvaez.**

Plaintiffs also assert that Mrs. Narvaez demonstrated actual authority when she signed the admission documents on behalf of Mr. Narvaez, and that Plaintiffs reasonably relied on her authority. Plaintiffs contend that it was reasonable for them to rely on Mrs. Narvaez's actual authority for at least two reasons. First, Mrs. Narvaez admitted Mr. Narvaez to Sagecrest and signed the admission documents on his behalf by virtue of her relationship as his spouse. (*See* Docs. 27 at 12; 31 at 5.) *See also Comstock*, 793 P.2d at 264. Second, Mrs. Narvaez signed documents which contained language stating that the person signing was the "responsible party" (Admission Contract ¶ 2) and was "authorized to sign this [Arbitration] Agreement on behalf of the Resident" (Arbitration Agreement at 5). By signing these two documents, as well as the other documents that related to Mr. Narvaez's treatment at and financial obligations to Sagecrest, Mrs. Narvaez "represented to Plaintiffs that she had and was exercising her proper authority to make decisions on behalf of Robert Narvaez regarding his residency at Sagecrest." (Doc. 27 at 13.)

Plaintiffs cite to two federal cases in support of their position that Mrs. Narvaez had actual authority to act on behalf of Mr. Narvaez: *THI of New Mexico at Hobbs Center, LLC v. Spradlin*

13

(*Spradlin*), 532 F. App'x 813 (10th Cir. 2013) and *THI of New Mexico at Vida Encantada, LLC v. Archuleta* (*Archuleta*), No. CIV. 11-399 LH/ACT, 2013 WL 2387752 (D.N.M. Apr. 30, 2013). (Doc. 31 at 4–5.) In *Spradlin*, the resident (Mr. Douglas Spradlin) signed a "Durable Power of Attorney for Financial and Healthcare Decision Making," appointing his daughter and son as his attorneys in fact. *Spradlin*, 532 F. App'x at 815 (citation omitted). His daughter signed THI's admission contract, but she marked the box to indicate that she was signing in her capacity as an "immediate family member," not in her capacity as attorney in fact. *Id.* (citation omitted). Mr. Spradlin's son later brought a wrongful death action and argued that because his father was incompetent when he appointed his children attorneys in fact, the daughter did not have authority to sign the admission contract. *Id.* at 816. The Tenth Circuit first noted that because the daughter signed the contract in her capacity as family member, the power of attorney was "irrelevant." *Id.* Second, the Tenth Circuit found that because the son failed to "dispute THI's assertion that Mr. Douglas Spradlin, despite not signing the Admission Contract, was bound by it as a third-party beneficiary[,]" he had waived any argument that the daughter had failed to bind her father to the contract. *Id.* The Tenth Circuit did not discuss the question of whether the daughter had actual authority to sign the contract based solely on her capacity as a family member (without a legally sufficient power of attorney) to bind her father to the admission contract and arbitration agreement. *See id.*

Nor did Judge C. Leroy Hansen with the United States District Court, District of New Mexico, explicitly examine that question in *Archuleta*. *See* 2013 WL 2387752, at *8–9. There, a daughter (Ms. Archuleta) signed her mother (Ms. Lucero) into a nursing home, despite the fact that Ms. Lucero was still "mentally competent and sharp and . . . [had] executed no powers of attorney." *Id.* at *2 (citation omitted). "Ms. Lucero did not know that her daughter signed the

contract on her behalf[,]" nor did she give anyone at the facility "express, verbal, or written permission for her to do so." *Id.* (citations omitted). "Ms. Archuleta, however, usually would sign hospital paperwork for her mother, and Ms. Lucero never objected to her doing so." *Id.* (citation omitted). Indeed, "Ms. Archuleta believed she had the authority to sign the contract on behalf of her mother." *Id.* (citation omitted). Just as in our own case, the admission contract contained an arbitration clause, and the only signature on the contract belonged to the resident's family member—not the resident herself. *Id.* at *2–3. Ms. Archuleta later filed a wrongful death action on behalf of Ms. Lucero's estate, and THI moved to compel arbitration. *Id.* at *4

After the parties briefed the motion to compel, the court certified "four questions to the New Mexico Supreme Court . . . ."[5] *Id.* at *5. In the Certification Order, the court "determined that Ms. Archuleta had implied authority to admit Lucero to a nursing home" despite the lack of evidence that Ms. Lucero had ever manifested "express or implied consent to her daughter's authority to agree to arbitration." *Id.* (quotation marks and citation omitted). The Certification Order does not contain any analysis on the issue of actual authority. *See THI of N.M. at Vida Encantada, LLC v. Archuleta*, No. CIV. 11-399 LH/ACT, Certification Order, at 3 (May 10, 2012 D.N.M.). The court cited this finding in its later opinion granting the motion to compel. *Archuleta*, 2013 WL 2387752, at *5. Because neither the Tenth Circuit in *Spradlin*, nor the District Court in *Archuleta*, reached the question of whether a family member without a power of attorney can have actual authority to bind a nursing home resident to an arbitration agreement without express or implied manifestations of assent from the resident, neither case is persuasive here.

---

[5] "After initially accepting the certification request and hearing oral argument, the New Mexico Supreme Court quashed its certification . . . ." *Archuleta*, 2013 WL 2387752, at *6 (citation omitted).

Plaintiffs failed to expand on the argument that Mrs. Narvaez had actual authority to bind Mr. Narvaez to the contract through his assent to her actions and/or by virtue of the circumstances of their relationship. *See Comstock*, 793 P.2d at 264. (*See also* Doc. 27-A at 37:3–13, 45:24–46:15 (Mrs. Narvaez stated that her husband was aware she was making care decisions on his behalf and did not object to her doing so, nor did he object to the decision to move him to Sagecrest).) Plaintiffs did not cite authority regarding what evidence is necessary to show such assent. Additionally Plaintiffs did not cite, nor can the Court find, any case from New Mexico that is instructive on whether the marital relationship alone is sufficient to find actual authority under these circumstances. Because the Court can grant Plaintiffs' motion on another basis, it declines to guess at how New Mexico courts would answer this question.

### C.     Mr. Narvaez was bound to the contract as a third-party beneficiary.

Defendant contends that Plaintiffs cannot bind Mr. Narvaez or his estate to the contract as a third-party beneficiary for four reasons: (1) the Arbitration Agreement was not required for admission to the nursing home; (2) there is no evidence that the Arbitration Agreement was intended to benefit Mr. Narvaez; (3) there was no contract to enforce, because Mrs. Narvaez did not have authority to bind Mr. Narvaez; and (4) New Mexico has only recognized the application of the third-party beneficiary doctrine for a party seeking to enforce a contract to which he was not a party. (Doc. 29 at 10–14.)

"Under New Mexico law, although not herself a signatory to a contract, a third-party beneficiary of a contract may be bound by, or seek to enforce, that contract." *Lovato*, 848 F. Supp. 2d at 1326–27 (citing *Fleet Mortg. Corp. v. Schuster*, 811 P.2d 81, 82 (N.M. 1991) (internal citation omitted)). "Whether a party is a third-party beneficiary depends on if the parties to the contract intended to benefit the third party." *Id.* (quoting *Fleet Mortg. Corp.*, 811 P.2d at 83

(internal citation omitted)). "Such intent must appear either from the contract itself or from some evidence that the [third party] is an intended beneficiary." *Id.* at 1326–27 (quoting *Fleet Mortg. Corp.*, 811 P.2d at 83 (internal quotation omitted)). "The third-party beneficiary doctrine applies to arbitration contracts." *Id.* at 1327 (citing *Rivera v. Am. Gen. Fin. Servs., Inc.*, 242 P.3d 351, 358 (N.M. Ct. App. 2010) (compelling arbitration pursuant to third-party beneficiary doctrine), *rev'd on other grounds*, 259 P.3d 803 (N.M. 2011)). "Further, 'a number of courts in other jurisdictions have used the third-party beneficiary doctrine to compel a non-signatory to arbitrate in circumstances similar to those here.'" *Id.* (quoting *THI of N.M. at Hobbs Ctr., LLC v. Patton* (*Patton*), No. CIV. 11-537 LH/CG, 2012 WL 112216, at *8 (D.N.M. Jan. 3, 2012) (collecting cases), *aff'd sub nom.*, *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694 (10th Cir. 2012), and *subsequently aff'd*, 741 F.3d 1162 (10th Cir. 2014)).

1. **The Arbitration Agreement was part of a larger, single contract, and there is evidence that the Arbitration Agreement was intended to benefit Mr. Narvaez.**

Defendant argues that because the Arbitration Agreement was not required for admission to the nursing home, and because there was no evidence that the agreement was intended to benefit Mr. Narvaez, Plaintiffs cannot establish he was a third-party beneficiary. (Doc. 29 at 10–11.) Defendant supports her first two arguments by citing to *Barker v. Evangelical Lutheran Good Samaritan Society*, 720 F. Supp. 2d 1263 (D.N.M. 2010), and the Court will address them together.

In *Barker*, a daughter signed the admission contract (including an arbitration agreement) to admit her father into a nursing home and rehabilitation facility before she was granted a power of attorney. 720 F. Supp. 2d at 1265. The court held that the daughter did not have the authority to sign on her father's behalf and that her father was not bound as a third-party beneficiary of the agreement. *Id.* at 1267–69. Specifically, the court found that while "Mr. Barker was the third-party

17

beneficiary of the Admission Agreement," that fact did not bind him to the arbitration agreement, because his "consent to arbitrate was not required for admission." *Id.* at 1268–69. Further, the court found that "there [was] no evidence that [the arbitration] agreement was intended to benefit" Mr. Barker; "[t]o the contrary, it might be asserted in this case that the arbitration agreement was intended to benefit only" the facility. *Id.* at 1269.

The Court finds *Barker* unpersuasive for two reasons. First, the Court has already found that the Arbitration Agreement was part of a single contract for admission. *See* infra Section IV(A). Although Sagecrest does not require a resident to agree to arbitrate disputes as a condition of admission, the contract's clear language and the fact that Sagecrest includes the Arbitration Agreement together with its Admission Contract "indicate that, as a part of its standard admission procedure, [Sagecrest] requires an agreement as to how a resident and [Sagecrest] will resolve future legal disputes." *Barron*, 265 P.3d at 726. It is appropriate, therefore, to consider whether Mr. Narvaez and his Estate are bound by the contract, which includes the Arbitration Agreement. *See id.* (finding that while nursing home does not require resident to agree to arbitration as condition of admission, arbitration form was "properly considered an admission document and that accepting or rejecting arbitration is part of the admission process").

Second, the Court finds *Barker* distinguishable because the language of the arbitration agreement there is different from that signed by Mrs. Narvaez. In *Barker*, the arbitration agreement appears to require that all disputes the resident might bring are subject to arbitration; it does not specifically mention any claims that the nursing home might have.[6] *Barker v. Evangelical*

---

[6] The arbitration agreement in *Barker* provided:

A. Resident's Rights. Any legal controversy, dispute, disagreement or claim arising between the parties after the execution of this Admission Agreement in which Resident, or a person acting on his or her behalf, alleges a violation of any right granted Resident under law shall be settled exclusively by binding arbitration . . . .

*Lutheran Good Samaritan Soc'y*, 10-cv-0003-JEC-RHS, Mem. in Support of Mot. to Dismiss & to Compel Arbitration, Ex. A at 17 ¶ A (D.N.M. Jan. 18, 2010). The *Barker* court did not go into detailed analysis of the agreement, but this may explain the court's comment that "it might be asserted that the" agreement was written only for the benefit of the nursing home. *Barker*, 720 F. Supp. 2d at 1269. The Arbitration Agreement Mrs. Narvaez signed appears to be more balanced, in that it applies to claims that either Mr. Narvaez or Sagecrest might make. (Doc. 1-C at ¶ 6 ("Resident and Facility acknowledge that they are each waiving their right to a jury trial . . . ."), ¶ 7 ("Any dispute between Resident and Facility, including, but not limited to, any claim for . . . nonpayment . . . .").)

In fact, other language included in the Arbitration Agreement demonstrates an intent to benefit Mr. Narvaez. (*See* Doc. 1-C.) For example, the agreement begins by recognizing "that court cases involve significant costs, long durations, potential delays, and uncertain results." (*Id.* at 1.) The agreement provides that the parties desire to "resolve . . . disputes . . . in a timely fashion and in a manner that minimizes costs to each." (*Id.*) The paragraph on the cost of arbitration is also crafted to benefit the resident: "Any filing or administration fees charged by an arbitration services provider in excess of the then-existing fee for filing a lawsuit in the state district court . . . shall be paid by Facility, regardless of which party initiates arbitration." (*Id.* ¶ 12.) Sagecrest also agreed to "pay all fees and expenses charged by the arbitrator, unless the Resident objects and wishes to

---

B. All Other Disputes. Any legal controversy, dispute, disagreement or claim of any kind arising out of, or related to this Admission Agreement, or the breach thereof, or, related to the care of stay at the Facility, shall be settled exclusively by binding arbitration . . . . This arbitration clause is meant to apply to all controversies, disputes, disagreements or claims including, but not limited to, all breach of contract claims, all negligence and malpractice claims, all tort claims, and all allegations of fraud concerning entering into or canceling this Admission Agreement. This arbitration provision binds all parties whose claims may arise out of or relate to treatment or service provided by the center including any spouse or heirs of the resident.

*Barker v. Evangelical Lutheran Good Samaritan Soc'y*, 10-cv-0003-JEC-RHS, Mem. in Support of Mot. to Dismiss & to Compel Arbitration, Ex. A at 17 ¶ A (D.N.M. Jan. 18, 2010).

pay some portion of those fees and expenses, not to exceed one-half . . . ." (*Id.*) None of this language was included in the arbitration agreement in *Barker*. *See Barker*, 10-cv-0003-JEC-RHS, Mem. in Support of Mot. to Dismiss & to Compel Arbitration, Ex. A at 17 ¶ A.

"The New Mexico Court of Appeals has specifically found that 'there are advantages to arbitration which, among other benefits, are that it generally costs less than litigation and leads to a quicker resolution.'" *Lovato*, 848 F. Supp. 2d at 1327 (quoting *Barron*, 265 P.3d at 732). The Court finds that the language of the Arbitration Agreement provides sufficient evidence that it was intended to benefit Mr. Narvaez. *See id.* at 1326–27 ("Such intent must appear either from the contract itself or from some evidence that the [third party] is an intended beneficiary.") (quoting *Fleet Mortg. Corp.*, 811 P.2d at 83).

> **2.    The Court finds that the New Mexico Supreme Court would recognize the application of the third-party beneficiary doctrine to bind a non-signatory to an arbitration agreement under these circumstances.**

The Court will address Defendant's third and fourth arguments together. Defendant argues that "as a mere logistical threshold, one cannot be the third-party beneficiary to a contract that actually purports to bind that person as a party." (Doc. 29 at 11.) In other words, Defendant asserts, "*if* Mrs. Narvaez was authorized to act on Mr. Narvaez's behalf, then a valid contract existed, and it bound Mr. Narvaez. If Mrs. Narvaez was *not* authorized to act on Mr. Narvaez's behalf, . . . then no valid contract existed, and no beneficiaries—third-party or otherwise—have remedies available under this invalid contract." (*Id.*) Defendant cites to cases from Maryland, Nebraska, and Mississippi state courts, but they are not binding on this Court. It appears that Defendant is primarily re-arguing her theory under agency law, which the Court addressed above.

The third-party beneficiary doctrine, however, is not an "'end-run' around the necessary elements of basic contract formation[,]" as Defendant suggests. (*Id.*) In fact, "traditional principles

of state law allow a contract to be enforced by or against nonparties to the contract through" a variety of theories, including the third-party beneficiary doctrine. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 708 (10th Cir. 2011) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (brackets and internal citation omitted)). Under traditional common law, only the parties who enter into a contract have rights and obligations under that contract; in other words, the parties must be in privity. 13 Williston on Contracts § 37:1 (4th ed.). But where a contract, such as the one here, is "made in which one party's performance [is] directed to a third party, not a party to the contracting process[,]" the traditional rule is "too harsh and inflexible." *Id.* Both courts and legislatures have eroded that traditional view over time in order to protect the rights of third parties, creating "an exception to the need for privity . . . through the doctrine of third party beneficiaries." *Id.*

In the context of an arbitration agreement, non-parties are generally not bound by either the agreement or the award. 21 Williston on Contracts § 57:19 (4th ed.). But where the third-party beneficiary doctrine applies, courts have found that "nonsignatories may be bound by arbitration agreements entered into by others . . . ." *Id.* "The New Mexico Supreme Court has not specifically addressed whether and under what circumstances the third-party beneficiary doctrine might apply to enforce an arbitration agreement between a signatory and non-signatory." *Patton*, 2012 WL 112216, at *8. "The New Mexico Court of Appeals, however, has applied the third-party beneficiary doctrine to an arbitration agreement when it held that a non-signatory to an arbitration agreement had a right to compel arbitration against a signatory to that agreement where the face of the arbitration agreement showed the parties' intent to grant to a class of entities, to which the non-signatory belonged, rights under the arbitration provisions." *Id.* (citing *Rivera*, 242 P.3d at 358). "This case, with respect to compelling Mr. [Narvaez's] Estate to participate in arbitration,

involves the inverse—Plaintiffs are attempting to enforce the contract against a non-signatory third-party beneficiary." *Id.*

In a case with circumstances similar to this one, Judge Hansen of the District of New Mexico addressed the question that is relevant here: "whether a non-signatory to the [arbitration] agreement can be forced to arbitrate pursuant to the" third-party beneficiary doctrine. *Id.* In *Patton*, the step-daughter of the resident signed an admission contract, including an arbitration agreement. *Id.* at *1–2. Judge Hansen noted that while state law generally prohibits non-signatories from being bound by an arbitration agreement, New Mexico courts recognize two applicable exceptions: the third-party beneficiary and equitable estoppel doctrines. *Id.* at *7 (citations omitted). There is no New Mexico state court case on point, but "[a] number of courts in other jurisdictions have used the third-party beneficiary doctrine to compel a non-signatory to arbitrate in circumstances similar to those here." *Id.* at *8 (citing *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 600 (5th Cir. 2007) ("holding under federal law that, where agreement signed by nursing home resident's mother on resident's behalf expressly named resident as person receiving care, non-signatory resident was third-party beneficiary of contract and bound by agreement to arbitrate contained therein"); *THI of S.C. at Columbia, LLC v. Wiggins*, No. 3:11-888-CMC, 2011 WL 4089435, at *6 (D.S.C. Sept. 13, 2011) ("holding that, under South Carolina law, arbitration provision in admission contract was binding on estate because decedent was third-party beneficiary of contract that was signed by his family member where decedent's care was essential purpose of contract"); *Cook v. GGNSC Ripley, LLC*, 786 F. Supp. 2d 1166, 1171–72 (N.D. Miss. 2011) ("applying Mississippi state law in holding that nursing home resident was intended third-party beneficiary of agreement signed by official of nursing home and resident's daughter, and thus, resident was bound by terms of contract including arbitration agreement"); *Alterra Healthcare Corp. v. Estate*

*of Linton*, 953 So. 2d 574, 579 (Fla. App. 2007) ("arbitration clause in assisted living facility's residency agreement was binding on resident's estate, even though agreement was not signed by resident, but rather her son, where resident was intended third-party beneficiary to agreement"); *Owens v. Coosa Valley Health Care, Inc.*, 890 So. 2d 983, 987 (Ala. 2004) ("non-signatory nursing home resident bound by terms of arbitration agreement in contract with nursing home where resident's guardian entered into agreement with home on resident's behalf")). Judge Hansen concluded, and this Court agrees, "that the New Mexico Supreme Court would likely follow the reasoning of the cases cited herein extending the third-party beneficiary doctrine to the situation at hand." *Id.*

The third-party beneficiary "doctrine requires an underlying contract, the performance of which is intended to benefit the third-party beneficiary." *Id.* at *9. Mrs. Narvaez stated that her husband was aware she was making care decisions on his behalf and did not object to her doing so, nor did he object to the decision to move him to Sagecrest. (Doc. 27-A at 37:3–13, 45:24– 46:15.) Accordingly, Mrs. Narvaez completed the necessary documents to admit her husband to Sagecrest: she signed the Admissions Contract as the "Responsible Party" and the Arbitration Agreement as Mr. Narvaez's "Representative." (Doc. 1-B at 12; Doc. 1-C at 5.) In fact, certain provisions of the contract bound Mrs. Narvaez personally. (*See*, *e.g.*, Doc. 27-B (holding Mrs. Narvaez, as the "responsible party," liable for payment "for Resident's care and services provided by" Sagecrest).) The Court finds that Mrs. Narvaez entered into a valid contract with Sagecrest.

The undisputed facts demonstrate that Mr. Narvaez was the intended third-party beneficiary of that contract. Mr. Narvaez was the resident to be admitted to Sagecrest, and the Admission Contract defined the rights and responsibilities of the resident. The "essential purpose" of the Admission Contract was to provide for Mr. Narvaez's care, *Patton*, 2012 WL 112216, at *9,

and Mrs. Narvaez's testimony confirms that the decision to move Mr. Narvaez was to provide him the care she no longer could (*see* Doc. 27-A at 29:2–13, 30:3–7, 33:24–34:3). Mr. Narvaez received Sagecrest's nursing care services, as contemplated by the contract. It is clear, therefore, that he was the intended beneficiary of the contract between Mrs. Narvaez and Sagecrest.

Defendant presents no additional argument to demonstrate why Mr. Narvaez should not be considered a third-party beneficiary to the parties' contract. The Court finds that Mr. Narvaez was a third-party beneficiary of the contract, including the Admission Contract and the Arbitration Agreement, even though he was not a signatory to the larger contract. Consequently, his Estate is bound by the terms of the Arbitration Agreement.

**D.    The Arbitration Agreement was not procedurally unconscionable.**

Defendant seeks to void the Arbitration Agreement on grounds that it is procedurally unconscionable. (Doc. 29 at 14–18.) "Unconscionability is an equitable doctrine that allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Patton*, 2012 WL 112216, at *16 (quoting *Rivera*, 259 P.3d at 817 (alterations in original)). "Procedural unconscionability . . . examines the particular factual circumstances surrounding the formation of the contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other." *Rivera*, 259 P.3d at 817 (quoting *Cordova v. World Fin. Corp. of N.M.*, 208 P.3d 901, 907–08 (N.M. 2009) (internal citation omitted)).

It is Defendant's burden to demonstrate procedural unconscionability. *Strausberg v. Laurel Healthcare Providers, LLC*, 304 P.3d 409, 411 (N.M. 2013). Defendant's arguments are not well-developed, but the Court will examine each in detail.

**1.     The Court finds no disparity in bargaining strength or sophistication between the parties.**

Defendant first asserts that it is "clear there was a disparity between the relative bargaining strength and sophistication of the parties," because it was a "confusing and stressful process" for Mrs. Narvaez, Ms. Arriaga put an "x" where Mrs. Narvaez should sign, neither Ms. Arriaga nor Mrs. Narvaez understood what the word "arbitration" meant, Mrs. Narvaez was not offered an interpreter or attorney, she was not given time to read the documents before she signed them, she was busy dealing with the care of her husband, she did not realize there was an arbitration agreement in the contract, her first language is Spanish, and she was not familiar with the nursing home admission process. (Doc. 29 at 15–18.)

The Court disagrees with Defendant's assertion that Mrs. Narvaez did not have time to read the contract before she signed it. (*Id.* at 17.) Mrs. Narvaez acknowledged at her deposition that she had time to read the contract, but she was understandably busy caring for her husband and had many things on her mind. (Doc. 31-B at 39:16–40:3, 53:8–13.) That she was busy, stressed, or confused is not reason to void a contract as procedurally unconscionable, as she had a ten day grace period to re-read the documents, seek an attorney's advice, research the definition of arbitration, or even ask for more time before signing. Further, thousands of consumers enter into contracts with healthcare facilities and other businesses every day—the simple fact that one party to such a contract is unfamiliar with the process is not enough, without more, to void a contract as procedurally unconscionable.

That Ms. Arriaga put x's where Mrs. Narvaez was to sign is similarly unpersuasive. Defendant did not argue that Mrs. Narvaez slavishly signed in each blank exactly where Ms. Arriaga commanded. To the contrary, it appears that Mrs. Narvaez took time to make caring—and

difficult—decisions for her husband's health and well-being at every turn: she signed an order that made it impossible for her husband to self-administer medication, she refused to allow the staff to use restraints on her husband, and she signed a "Do Not Resuscitate" order, requesting "limited EMS care" in the event her husband's heart stopped beating or if he stopped breathing. (Docs. 27-F–H.) Mrs. Narvaez testified, and the Court believes, that the decisions she made she believed were in his best interest. (Doc. 27-A at 45:24–46:8.)

Defendant does not cite, nor can the Court find, authority to establish that Sagecrest was at fault for failing to offer an attorney or interpreter to Mrs. Narvaez during the admission process, or that the contract should be void as unconscionable because Mrs. Narvaez's first language is Spanish. It was Mrs. Narvaez's responsibility to find an attorney or interpreter to help her understand the contract terms. Further, the Court finds that while Mrs. Narvaez is more comfortable with Spanish, she also stated that she understands both spoken and written English. (*See*, *e.g.*, Doc. 31-B at 5:9–11, 11:25–12:1, 17:10–12, 40:18–23.) She has served as a juror in a criminal trial without the need for an interpreter. (*Id.* at 6:11–7:14.) And she specifically asserted that the fact that the Admission Contract was in English did not impact her ability to read or understand it. (*Id.* at 40:8–23.)

"Each party to a contract . . . has a duty to read and familiarize herself with its contents before signing it, and thus, a party who executes and enters a written contract is presumed to know the terms of the agreement and to have agreed to each of its provisions in the absence of fraud, misrepresentation, or some other wrongful act." *Patton*, 2012 WL 112216, at *22 (quoting *Smith v. Price's Creameries*, 650 P.2d 825, 829 (N.M. 1982) (internal citation omitted, alterations in original)). Mrs. Narvaez did not read or familiarize herself with the contract before signing it, but that does not mean the contract is procedurally unconscionable.

2. **Defendant has failed to demonstrate the agreement was an adhesion contract or that Mrs. Narvaez was unable to accept or decline the terms.**

Defendant also argues that Mrs. Narvaez did not feel free to accept or decline the terms demanded by Sagecrest, and that the contract was one of adhesion. (Doc. 29 at 15.) "When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion. An adhesion contract is a standardized contract offered by a transacting party with superior bargaining strength to a 'weaker party on a take-it-or-leave-it basis, without opportunity for bargaining.'" *Rivera*, 259 P.3d at 817 (quoting *Cordova*, 208 P.3d at 910 (internal quotation omitted)). Defendant essentially argues that because she did not understand the "five pages of densely worded, legalistic text" (Doc. 29 at 15), and because her husband was already at Sagecrest and there was nowhere else for him to go, that she did not feel free to decline any of the contract terms. (*See* Doc. 29 at 15–17.)

The courts in *Archuleta* and *Patton* examined similar arguments and found them lacking. The defendant in *Archuleta* argued that Ms. Archuleta "did not understand the arbitration clause, she did not feel free to decline the terms demanded, and [her mother] had been living in the facility for nine days already." 2013 WL 2387752, at *17. The defendant in *Patton* argued that the step-daughter "was in a greatly diminished bargaining position where she did not understand the arbitration clause and did not feel free to decline the terms demanded." 2012 WL 112216, at *22. Both courts found, though, that a person's "subjective feeling of not being free to decline arbitration terms is not enough to demonstrate procedural unconscionability." *Archuleta*, 2013 WL 2387752, at *17; *see also Patton*, 2012 WL 112216, at *22. Mrs. Narvaez also argues that she felt unable to accept or decline the contract terms, and that she could not move Mr. Narvaez to another nursing home. But Defendant did not provide any evidence that there were "no other reasonable

27

nursing home facilities available to [Mr. Narvaez] such that she was forced to accept the arbitration terms." *Patton*, 2012 WL 112216, at *22; *see also Archuleta*, 2013 WL 2387752, at *17–18; *Lovato*, 848 F. Supp. 2d at 1324–26; *Spradlin*, 532 F. App'x. at 818. As in *Archuleta* and *Patton*, the Court finds that Mrs. Narvaez's subjective feeling of being unable to decline the contract terms is not enough to establish procedural unconscionability.

Moreover, "the terms of the Arbitration Agreement are straight-forward and clear enough that an unsophisticated lay person could understand." *Patton*, 2012 WL 112216, at *22. Paragraph 3 defines arbitration, paragraph 13 describes the process and procedure of arbitration, and paragraph 6 provides that the parties are waiving their right to a jury try and to trial by judge in a court of law. (Doc. 1-C ¶¶ 3, 6, 13.) The waiver of this right is repeated in the title of the document (New Mexico Agreement Regarding Resolution of Legal Disputes and Waiver of Right to Jury Trial) as well as in the bolded, capitalized block of text above the signature lines ("THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY."). (*Id.* at 1, 4.) Paragraph 5, part of which is bolded in the agreement, encourages the resident to seek the advice of an attorney. (*Id.* ¶ 5.) And paragraph 4 explicitly provides that the resident does not need to sign the Arbitration Agreement as a condition for being admitted to Sagecrest. (*Id.* ¶ 4.) The block of text above the signature lines includes yet another reminder about the right to seek legal counsel, and the provision that signing is not a condition of Sagecrest providing services to the resident. (*Id.* at 4.)

Finally, the Arbitration Agreement was not offered on a take-it-or-leave-it basis, because Mrs. Narvaez was free to decline it: the contract specified that agreeing to arbitrate was not a

condition for admission. (Doc. 1-C ¶ 4.) The contract also gave her ten days to revoke her agreement. (*Id.* ¶ 20.) "A contract is procedurally unconscionable 'only where the inequality is so gross that one party's choice is effectively non-existent.'" *Patton*, 2012 WL 112216, at *22 (quoting *Guthmann v. LaVida Llena*, 709 P.2d 675, 679 (N.M.1985) (internal citations omitted), *overruled on other grounds by Cordova*, 208 P.3d at 909–10). "Factors in this analysis include the use of high pressure tactics; the relative education, sophistication, or wealth of the parties; and the relative scarcity of the subject matter of the contract." *Id.* (citing *Guthmann*, 709 P.2d at 679). "There are no other facts before the Court to suggest that [Mrs. Narvaez] was of such diminished capacity or intelligence that she was incapable of understanding the ramifications of signing the Arbitration Agreement." *Id.* There is no evidence that Sagecrest pressured Mrs. Narvaez to sign the contract, nor does Defendant allege fraud, misrepresentation, or any other wrongful act. *See id.* Accordingly, the Court finds that the Arbitration Agreement is not invalidated due to procedural unconscionability.

## V.   Conclusion

Plaintiffs have met their burden of establishing that there is a valid Arbitration Agreement sufficient to bind Mr. Narvaez's Estate. Based on the record, the Court finds the Arbitration Agreement is not procedurally unconscionable. It is appropriate, therefore, under Section 4 of the FAA, to compel Defendant to arbitrate her claims against Plaintiffs.

**THEREFORE,**

**IT IS ORDERED** that Plaintiffs' motion to compel arbitration (Doc. 27) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant shall arbitrate the claims asserted in the state court action against Plaintiffs in accordance with the terms of the Arbitration Agreement;

**IT IS FURTHER ORDERED** that this case is dismissed.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**